CHANCERY.

## Chenault and Others *against* Barr and Others.

[Mr. Turner for plaintiffs: Mr. Owsley, Mr. Breck and Mr. Goodloe for defendants.]

### FROM THE CIRCUIT COURT FOR MADISON COUNTY.

*May* 8.      Chief Justice ROBERTSON delivered the Opinion of the Court.

By a contract made in expectation of a marriage, the parties agreed that, in the event of the marriage, the husband should convey certain slaves of the wife to a trustee, in trust for her and her heirs and assigns forever, to be disposed of by her [at any time during her life] as tho' the intended marriage had never taken place; with a *N. B.* that the slaves were to be kept in the wife's possession during her life:—

A line that was effaced *is* presumed to have contained words harmonizing with the rest--as those in brackets.

The term 'heirs' should be understood as a word of limitation; not of purchase, and the terms 'to her and her heirs and assigns forever,' import that the wife's title was to be absolute & unlimited, & corresponding words being put in place of the lost line, the writing must be understood as stipulating that she should have a

IN June, 1822, in the prospect of a contemplated marriage, which was afterwards consummated, between Josiah Phelps and Mary Collins—they made a contract in writing with one Richard Morton, whereby it was agreed that Phelps should, in the event of the marriage, settle on his intended wife some slaves (which she owned,) by an effectual conveyance to the said Morton, in *trust* for her and "her heirs and assigns forever, and to " and for no other use, intent or purpose whatsoever—to " be by her disposed of—      (one line effaced) "intended marriage had never taken place;" and to which the following *nota bene* was appended—"It, never- " theless is to be understood, that the said negroes are to " be kept in her possession during her life."

No other instrument of writing having ever been executed, nor any other disposition made of the slaves, during the wife's life, she, on her death bed, declared that the antenuptial agreement had been set aside, and she also gave the slaves to her husband, with the solemn injunction that he should emancipate two of them, which he accordingly did, and give another to one of his daughters—which he also did, and dispose of the only other remaining one as he should think fit; and this slave was, after the death of Phelps, sold by his personal representative.

After the death of both Phelps and his wife, the defendants in error, claiming the slaves as the collateral heirs and distributees of the deceased wife, brought this suit in chancery for enforcing the marriage agreement and obtaining a decree for all the slaves, or their value. And upon the final hearing of the case, upon the bill, an-

swers and sundry depositions, the Circuit Judge decreed that *Chenault*, the personal representative of *Phelps*, should pay to the complainants the ascertained value of the unliberated slaves. And the defendants in the Court below, now seek a reversal of that decree.

As the executory marriage contract was never executed by any conveyance by the husband, the legal title to the slaves of the wife vested in *him*, in virtue of their marriage. And as she, in fact, disposed of the slaves, and he afterwards only consummated her declared purpose concerning them—the only question we shall consider is whether any equitable title to them passed by law to her kindred. And this question depends chiefly on the true constructive effect of the marriage articles.

It seems clear to us, that "*heirs*" in the agreement, should be understood as a term of limitation, and not of purchase.

To "her and her heirs and *assigns* forever" imports that her title was to be absolute and unlimited; and if "heirs" be a word of purchase, "*assigns*" must be a word of purchase also, which would be rather absurd.

Filling the blank line, as we should do, so as to make it harmonize with what is now legible, the contract would, probably and almost certainly, import that the wife was to have the power to dispose of the slaves during her life, just as she might have done if the "intended marriage had never taken place." And this would confirm the deduction that, the absolute title was to be in her after marriage, as it had been before, and that "her heirs and assigns" were used as terms of limitation merely.

The *nota bene*, instead of being, as argued, inconsistent with this interpretation, is corroborative of it. It implies that, without the restriction imposed by it, the wife might make such a disposition of the slaves as would deprive the husband of the use of them, and that the trustee might take them from her, and hire them out. And the only rational object of it seems to have been to show that, though the wife had reserved the power of disposing of the slaves, and though the legal title was to be vested in a trustee, she *should*, nevertheless, *keep* them

right to dispose of the slaves during her life. This construction is confirmed by the *N. B.* which shows that the husband was to have the use of the slaves while the wife retained them.

As the marriage took place, but the conveyance to the trustee was never made, the legal title to the slaves vested in, & remained with, the husband.

The wife, on her death bed, declared that the antenuptial contract had been set aside, and gave the slaves to her husband—enjoining *him* to dispose of them according to the directions she then gave; which he did. And, as the legal title & possession were with the husband—and if the wife had any equity—which, considering her dying declaration, is very doubtful—it was a right to dispose of them absolutely—which she in effect did—a ct. of equity should not interpose in favor of her collateral kindred.

Spring Term
1839.

in her own possession during her life. Unless this was the object, we can perceive none that was proper or consistent.

Then the legal title and possession, being, as they certainly were, in the husband—even *if the wife* had any existing equity after their marriage—which is rendered at least doubtful by her own subsequent declarations and other facts—it seems clear to us, that her interest being, as it was, subject to her own absolute control, just as if she had been a *feme sole,* her disposition of the slaves and her dying declarations and injunctions present a state of case very different from such an one as should incline a court of conscience to disregard her acts and wishes, and now, at the instance of her *collateral kindred,* enforce a specific execution of the antenuptial agreement.

Wherefore, the decree is reversed, and the cause remanded, with instructions to dismiss the bill.